**Juan C. Chavez**, OSB #136428
jchavez@ojrc.info
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

      Of Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| ADAM STEVEN ANDERSON,<br><br>Plaintiff,<br>    v.<br>JEREMY FIFER; PATRICK UTTER; JASON MOORE; CHRIS BEDSAUL; sued in their individual capacity; and STEVE FRENCH; DAN BUCKWALD; JOHN BATTLE; MARIA VALDENEGRO; VICTOR RICHTENSTIEN; JANE DOE#1, all sued in both their individual and official capacities,<br><br>Defendants. | Case No. 6:16-cv-02044-MC<br><br><br>BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 5

II. STATEMENT OF FACTS .................................................................................... 5

III. STANDARDS FOR SUMMARY JUDGMENT ................................................ 8

IV. ARGUMENT ........................................................................................................ 9

    A. Qualified Immunity Does Not Bar Mr. Anderson's Suit ............................ 9

        1. As an affirmative defense, Qualified Immunity must be raised at the Answer
        phase. Defendants' failure to do so renders those arguments moot ...................... 9

        2. Qualified Immunity is neither legally tenable nor prudentially sustainable. ...... 9

    B. The Rights of the Imprisoned ...................................................................... 13

        1. The Eighth Amendment .............................................................................. 13

            a. Medical Needs .................................................................................... 14

            b. Strip Searches .................................................................................... 16

            c. Adequate Sanitation ........................................................................... 17

            d. Solitary Confinement .......................................................................... 17

            e. Pepper spraying and decontamination ................................................. 19

            f. Adequate Diet ..................................................................................... 20

        2. The Due Process Clause ............................................................................. 20

            a. Solitary Confinement .......................................................................... 22

            b. Excessive Force .................................................................................. 22

            c. Access to the Courts ........................................................................... 23

        3. The First Amendment ................................................................................. 23

        4. The Fourth Amendment .............................................................................. 24

        5. Supervisory Liability ................................................................................. 25

    C. Mr. Anderson's Claims Need to Be Tried Before a Jury ......................... 25

        1. Claims 1 to 5, 11 to 12: Malicious Strip Searches, Abuse, Unsafe Conditions
        and Retaliation in the Disciplinary Segregation Unit ........................................ 25

        2. Claim 6: Pepper Spray and Inadequate Decontamination ............................... 29

        3. Claims 7 to 9: Forcible Medication, Failure to Treat, and Use of Force .......... 29

    V. CONCLUSION ................................................................................................. 32

**TABLE OF AUTHORITIES**

**Cases**

*Bell v. Wolfish*, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) .............. 14, 24
*Bounds v. Smith*, 430 U.S. 817, 828 (1977) ................................................................................ 23
*Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ......... 11, 12
*Brown v. Oregon Dept. of Corrections*, 751 F.3d 983, 988 (9th Cir. 2014) .................................. 22
*Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1147 (9th Cir. 2011) .................. 16, 24
*Cain v. Lane*, 857 F.2d 1139, 1143 (7th Cir. 1988) ..................................................................... 24
*Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)...................................... 15
*Clement v. Gomez*, 298 F3d 898, 906 (9th Cir 2002) ...................................................... 12, 14, 19
*Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) ....................................................................... 10
*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ..................................................................... 13, 20
*Foster v. Runnels*, 554 F.3d 807, 812–13 (9th Cir.2009) ............................................................. 20
*Friedman v. Boucher*, 580 F.3d 847, 856-57 (9th Cir. 2009) ...................................................... 25
*Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989 ...................................................................... 22
*Hamilton v. County of San Bernardino*, 325 F.Supp.2d 1087, 1090 (C.D.Cal. 2004) ............... 23
*Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992) ........................................................... 15
*Hanon v. Dataproducts Corp.*, 976 F2d 497, 500 (9th Cir 1992)................................................. 8
*Harlow v. Fitzgerald*, 457 US 800, 818 (1982) ........................................................................... 11
*Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999) .............................................................. 16
*Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) ................................................................. 25
*Hewitt v. Helms*, 459 U. S. 460, 471-472 (1983) ........................................................................ 21
*Hope v. Pelzar*, 536 US 730, 733, n. 1 (2002) ..................................................................... 11, 12
*Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) .......................................................... 17
*Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) ................................................................. 13, 16
*In re Medley*, 134 U.S. 160, 168 (1890 ....................................................................................... 17
*Jordan v. Gardner*, 986 F.2d 1521, 1526 (9th Cir. 1993)............................................................ 20
*Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir.1996) ................................................................... 20
*Lavender v. Lampert*, 242 F.Supp.2d 821, 843 (D. Or. 2002) ..................................................... 15
*LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993) ............................................................... 20
*Lewis v. Casey*, 518 U.S. 343, 351-53 (1996)............................................................................. 23
*Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D.Cal. 1995) ................................................ 18, 19
*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992)........................................... 14, 15, 19
*Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002) .................................................................... 20
*Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011) ................................................................... 15
*Pearson v. Callahan*, 555 US 223, 234 (2009)..................................................................... 11, 12
*Peckham v. Wisconsin Dep't of Correction*, 141 F.3d 694, 697 (7th Cir. 1998)......................... 25
*Porter v. Clarke*, 290 F.Supp.3d 518, 529 (E.D. Vir. 2018)....................................................... 18
*Procunier v. Martinez*, 416 U.S. 396, 413-16 (1974) ................................................................. 23
*Ramos v. Lamm*, 639 F.2d 559, 567–69 (10th Cir. 1980)............................................................ 17
*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005)........................................................ 24
*Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir.1984) ..................................................................... 9
*Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017)............................................................................... 17
*Sandin v. Conner*, 515 U.S. 472, 483 (1995) .............................................................................. 21
*Saucier v. Katz*, 533 U.S. 194, 201 (2001) ................................................................................. 11
*Scher v. Engelke*, 943 F.3d 921, 923-24 (8th Cir. 1991) ............................................................ 16

*Shomo v. City of New York*, 579 F.3d 176, 184-85 (2d Cir. 2009) ................................................ 15
*Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) ...................................................................... 25
*Stewart v. Stewart*, 60 F.App'x 20 (9th Cir. 2003) ...................................................................... 19
*Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) .............................................................. 20
*Thompson v. Raheem*, 885 F. 3d 582, 586 (9th Cir. 2018) ............................................................ 22
*Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ............................................................................ 11, 12
*Toussaint v. McCarthy*, 597 F. Supp. 1397, 1411 (N.D. Cal. 1984) ............................................... 17
*Turner v. Safely*, 482 U.S. 78 (1987) ................................................................................. 16, 24
*Ustrak v. Fairman*, 781 F.2d 573, 577-78 (7th Cir.) .................................................................... 23
*Vaughan v. Ricketts*, 859 F.2d 736, 742 (9th Cir.1988) ............................................................... 20
*Vitek v. Jones*, 445 U. S. 480, 491-494 (1980) .......................................................................... 21
*Washington v. Harper*, 494 U. S. 210, 221-222 (1990) ................................................................ 21
*Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) ................................................. 25
*White v. Pauly*, 137 S.Ct. 548, 551 (2017) .............................................................................. 12
*Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) ......................................................................... 22
*Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) ............................................................ 16
*York v. Story*, 324 F.2d 450, 455 (9th Cir.1963) ....................................................................... 24
*Ziglar v. Abbasi*, 137 S.Ct. 1843, 1870-72 (2017) .................................................................... 10

## Rules

42 U.S.C. §1983 ........................................................................................................................ 9
FRCP 56(c) ............................................................................................................................... 8
FRCP 8 ...................................................................................................................................... 9

## Constitutional Provisions

Eighth Amendment ................................................................................................................. 13
First Amendment .................................................................................................................... 23
Fourteenth Amendment .......................................................................................................... 20
Fourth Amendment ................................................................................................................. 24

# I. INTRODUCTION

Mr. Anderson alleges in his First Amended Complaint that he was subjected to numerous violations of Federal Constitutional Law and State Tort Law. Mr. Anderson alleges that the named-defendants participated in these deprivations. Defendants have moved for Summary Judgment in three parts—one of which Mr. Anderson personally responded to and two which remain unanswered. In this brief, Plaintiff intends to answer to the two remaining summary judgment motions made against him and supplement the brief already filed. In his brief, *see below*, Mr. Anderson argues that Defendants' Motions for Summary Judgment should be denied, because he has remedies at law, and the defendants are not owed any immunity.

# II. STATEMENT OF FACTS

Mr. Anderson's myriad of claims arise from his time at the Lane County Jail in Eugene, OR. Mr. Anderson filed this lawsuit *pro se*, and with the assistance of counsel submitted an Amended Complaint. Dkt. 100. His claims are based on Defendants' following conduct and claims:

**Claim 1.** Performing an unnecessary and malicious strip search on Mr. Anderson that occurred on February 12, 2016, and depriving Mr. Anderson of the ability to grieve the matter against Defendant Fifer (Against Defendant Fifer, French, Buckwald, and Moore; Constitutional rights implicated: First, Fourth, Eighth, and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence);

**Claim 2.** Placing Mr. Anderson in a fecal matter smeared segregation unit on April 12, 2016 (Against Defendant French, Buckwald, and Moore; Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Negligence);

**Claim 3.** Putting Mr. Anderson on a dietary regime that made him malnourished (against Defendant Battle; Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Negligence);

**Claim 4.** Interning Mr. Anderson in a fecal matter smeared segregation unit without access to cleaning supplies (Against Defendant French, Buckwald, and Moore Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Negligence);

**Claim 5.** Denying Mr. Anderson access to the law library and thus the Courts (Against Defendant French, Buckwald, and Moore Constitutional rights implicated: Fourteenth Amendment);

**Claim 6.** Excessively pepper-spraying Mr. Anderson after he suffered a mental breakdown because of the hazardous conditions of solitary confinement on or around June 25, 2016, failing to decontaminate him, and failing to properly medically check him despite serious injury (Against Defendants Fifer, Battle, French, Buckwald, and Moore; Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence);

**Claim 7.** Forcing medication on Mr. Anderson against his will and against community practices on or around June 25, 2016 and July 3, 2016, causing him to grow delirious and chew his arm (against Defendants Moore, Ceulho, and Richtenstein; Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence);

**Claim 8.** Viciously attacking a still recovering Mr. Anderson on July 4, 2016, failing to properly medically evaluate him on July 7, 2016, and again forcing medication on Mr.

Anderson against his will and against community practices (against Defendants Fifer, Utter, Bedsaul, Valdenegro, Richtenstein, Ceulho, Battle, French, Buckwald, and Moore Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence);

**Claim 9.** Again forcing medication on Mr. Anderson against his will and against community practices on or around July 5, 2016, causing him delirium and to fall on injure himself repeatedly (Against Defendants Fifer, Utter, Bedsaul, Valdenegro, Richtenstein, Ceulho, Battle, French, Buckwald, and Moore Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence);

**Claim 10.** Confiscating Mr. Anderson's medically necessary glasses for 81 days in total for different periods of time within the Lane County Jail (against Defendants French, Buckwald, and Moore Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Negligence);

**Claim 11.** Performing persistent, retaliatory daily strip searches of Mr. Anderson despite near constant surveillance of his cell (against Defendant Fifer, Utter, Bedsaul, French, Buckwald, and Moore; Constitutional rights implicated: Fourth, Eighth, and Fourteenth Amendments; State tort violations: Battery, Assault, and Negligence); and

**Claim 12.** Humiliating Mr. Anderson by parading him naked and leashed like a dog in front of 15 to 20 Lane County Jail staff people, men and women, on or about July 15, 2016 (against Defendants Fifer, Bedsaul, French, Buckwald, and Moore; Constitutional rights implicated: Eighth and Fourteenth Amendments; State tort violations: Negligence).

These facts are spread across Plaintiff's First Amended Complaint, and in total describe Defendants' consistent pattern and practice of depriving Mr. Anderson's rights as a pre-trial detainee.

### III. STANDARDS FOR SUMMARY JUDGMENT

To qualify for a grant of summary judgment, a moving party must establish the absence of any "genuine issue as to any material fact." FRCP 56(c). "A material fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hanon v. Dataproducts Corp.*, 976 F2d 497, 500 (9th Cir 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248, 106 S Ct 2505, 91 L Ed2d 202 (1986)). The inquiry is "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 US at 250.

At the summary judgment stage, when overcoming a defendant's motion for summary judgment a plaintiff's burden "is not high." *Pottenger v. Potlatch Corp.*, 329 F3d 740, 746 (9th Cir 2003). In the Ninth Circuit, the following qualifications would need to be satisfied:

> (1) "[M]ake a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof" at trial;
> (2) Show that "there is an issue that may reasonably be resolved in favor of either party," and that the issue should therefore be resolved by the finder of fact; and
> (3) "[C]ome forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible."

*British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F2d 371, 374 (9th Cir 1989); *Leisek v. Brightwood Corp.*, 278 F3d 895, 898 (9th Cir 2002) ("If the moving party shows the absence of a genuine issue of material fact, the non-moving party

must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial."
(quoting *Celotex Corp. v. Catrett*, 477 US 317, 323–324, 106 S Ct 2548, 91 L Ed2d 265
(1986))).

## IV. ARGUMENT

### A. Qualified Immunity Does Not Bar Mr. Anderson's Suit

1. As an affirmative defense, Qualified Immunity must be raised at the Answer phase. Defendants' failure to do so renders those arguments moot.

Since qualified immunity is a defense, the burden of pleading it rests with the defendant. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *see* FRCP 8(c) ("a party must affirmatively state any avoidance or affirmative defense…"). In the absence of a showing of prejudice, however, an affirmative defense may be raised for the first time at summary judgment. *See Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir.1984).

Plaintiff has proceeded with his case largely *pro se*, but with the assistance of two pro bono counsels. His initial pleadings were not answered with the affirmative defenses of qualified immunity, and Mr. Anderson could not have foreseen such a defense being raised until he received counsel. Mr. Anderson's previous pro bono counsel filed an Amended Complaint, which too was answered but not with the affirmative defense of qualified immunity. Despite having had two opportunities to do so, Defendants raise qualified immunity now at the Summary Judgment stage, prejudicing Mr. Anderson.

2. Qualified Immunity is neither legally tenable nor prudentially sustainable.

Plaintiff respectfully submits that the defense of qualified immunity is, and should be held to be, a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. §1983 was enacted. Defendants cannot show that this would include correctional doctors and medical staff. As applied to persons not immunized under

common or statutory law in 1871, the defense of qualified immunity is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of 42 U.S.C. §1983. *See Ziglar v. Abbasi*, 137 S.Ct. 1843, 1870-72 (2017) (Thomas, J., concurring); *see also Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("As I have observed earlier, our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume.") An analysis of the baselessness and disutility of the current judge-created qualified immunity defense appears at Baude, *Is Qualified Immunity Unlawful*, 106 Cal. L. Rev. 101 (forthcoming 2018); *see also* Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 Mich. L. Rev. 1219, 1244–1250 (2015).

Additionally, qualified immunity cannot be justified as an alleviation of burdensome litigation. As a Yale Law Journal study explained:

> Although qualified immunity terminated only 3.9% of the 979 cases in my dataset in which qualified immunity could be raised, the defense was in fact raised by defendants in more than 37% of these cases--and was sometimes raised multiple times, at the motion to dismiss stage, at summary judgment, and through interlocutory appeals. Each time qualified immunity is raised, it must be researched, briefed, and argued by the parties and decided by the judge…
>
> [I]n the five districts in my study, just 8.6% of qualified immunity motions brought by defendants in my docket dataset resulted in case dismissals. The remaining 91.4% of qualified immunity motions brought by defendants required the parties and judges to dedicate time and resources to briefing, arguing, and deciding the motions without shielding defendants from discovery and trial.

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 60–61 (2017).

Plaintiff recognizes that this court may consider itself bound by law assuming and adjudicating the availability of qualified immunity to correctional officers violating federal or constitutional mandates that are not "clearly established." Nevertheless, he presents this objection in support of an effort to modify existing law, thereby preserving his opposition to Defendants invocation of this defense, which opposition may be subject to further adjudication within the federal judiciary. Having stated this objection, Plaintiff proceeds to address the qualified immunity defense on the merits.

### 2. Defendants Should Not Receive Qualified Immunity, and Should Answer to a Jury

Qualified immunity protects "government officials performing discretionary functions.. from liability for civil damages..." *Harlow v. Fitzgerald*, 457 US 800, 818 (1982). Qualified immunity calls for a two-pronged analysis: 1) whether the rights and law establish that a protected right was violated; and 2) whether the rights were reasonably known at the time the defendant acted. *Pearson v. Callahan*, 555 US 223, 234 (2009).

Under these prongs, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014), *citing Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Hope v. Pelzar*, 536 US 730, 733, n. 1 (2002). This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, *citing Anderson*, 477 U.S., at 249, 106 S.Ct. 2505.

Qualified immunity does not protect government officials who violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 US 800, 818 (1982). It is not a requirement for the action to have been previously held unlawful; rather, for the immunity to be inapplicable, a party need only show that in light of pre-existing law the unlawfulness is apparent. *Hope v. Pelzar*, 536 US 730, 739 (2002); *see also Clement v. Gomez*, 298 F3d 898, 906 (9th Cir 2002) (the focus is on whether the status of the law gave "fair warning" to officials that their conduct was unconstitutional.). Caselaw "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (slip op., at 6) (internal quotation marks omitted). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* at 552 (internal quotation marks omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzar*, 536 U. S. 730, 741 (2002).

When adjudging qualified immunity, it is crucial for courts to draw "inferences in favor of the nonmovant, even when… a court decides only the clearly-established prong of the standard." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions. *Id.*; *See Brosseau*, supra, 198 (inquiring as to whether conduct violated clearly established law "in light of the specific context of the case" and construing "facts… in a light most favorable to" the nonmovant).

Lastly, post-*Pearson v. Callahan*, the "rigid order" of reviewing cases by first analyzing whether there was a violation of the right, then examining whether that right had been "clearly

established" has been disbanded, *Pearson*, 555 U.S. at 235, Mr. Anderson requests that the Court to answer the first question posed by *Pearson*, and determine whether a constitutional right had been violated under the given circumstance. While abandoning the mandatory nature of two-step analysis, the Court continued to recognized that the approach can be beneficial in promoting "the development of constitutional precedent[,]" and "is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id*. at 236.

Because the analysis as to whether Mr. Anderson's claims were properly plead, and whether or not they were clearly established or violated, Mr. Anderson will discuss each claim in tandem with its clearly established case law and the individual Defendants' participation in the respective deprivation.

## B. The Rights of the Imprisoned

### 1. The Eighth Amendment

The Eighth Amendment imposes certain duties on prison officials: (1) to provide humane conditions of confinement; (2) to ensure that inmates receive adequate food, clothing, shelter and medical care; and (3) to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). An Eighth Amendment claim based on deliberate indifference must satisfy both an objective and a subjective component test. *Id.* at 834. A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *accord Clement v. Gomez*,

298 F.3d 898, 904 (9th Cir. 2002) ("The inmates must demonstrate that they were confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind' in denying the proper medical care. Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation." (citation omitted)).

For a pretrial detainee like Mr. Anderson, the rights secured and articulated under the Eighth Amendment arise as a cause of action under the Fourteenth Amendment's substantive due process clause. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (explaining that the Due Process Clause applies when "considering the claims of pretrial detainees").

<u>a. Medical Needs</u>

In *Estelle v. Gamble*, the Supreme Court held that a prison official's deliberate indifference to serious medical needs violates the Eighth Amendment. 429 U.S. at 106. A serious medical need is present, when, for example, the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Clement*, 298 F.3d at 904 (citations omitted). One such factor is existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain[.] *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992) *overruled on other grounds by WMX Tech., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir.1997). The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing

administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be demonstrated by the way in which prison officials provide medical care. *Id.* at 1059–60. "A finding of deliberate indifference necessarily precludes a finding of qualified immunity." *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992). The deliberate indifference standard under either the Eighth or Fourteenth Amendment is the same. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

Repeated examinations and assessments do not absolve prison staff of liability if they do not actually provide treatment. *Lavender v. Lampert*, 242 F.Supp.2d 821, 843 (D. Or. 2002) (deliberate indifference claim was supported where plaintiff was examined regularly by medical staff but "there is an ongoing pattern of ignoring, and failing to timely respond to or effectively manage, plaintiff's chronic pain"); *see also Shomo v. City of New York*, 579 F.3d 176, 184-85 (2d Cir. 2009) (where plaintiff alleged a policy of disregarding medical recommendations for treatment, claim was not refuted by his having frequently seen doctors who administered tests). Failure to inquire into facts necessary to make a professional judgment can also factor into whether a defendant was deliberately indifferent to a serious medical need. *See Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011) (failure to measure prisoner's vision for two years after likely future need for surgery was acknowledge; "Physicians cannot escape liability simply by 'refusing to verify underlying facts' regarding the potential need for treatment." (citation omitted)).

b. Strip Searches

The Eighth Amendment does protect against searches amounting to "calculated harassment unrelated to prison needs." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). The Ninth Circuit has not expounding on the "calculated harassment" question. Much more of the Court's discussion has been centered on the Fourth Amendment analysis, *see below*, and thus runs through the case *Turner v. Safely*, 482 U.S. 78 (1987). When the Ninth Circuit has focused on the 8th Amendment in the context of strip searches, it primarily viewed the question under the 14th Amendment lens. In *Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1147 (9th Cir. 2011), the Court noted that the presence of onlookers and videotaping of the strip search compounded the indignity of a non-emergency crossgender strip search.

The Fifth Circuit explored the question of what constituted "calculated harassment" could mean in *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). In that case, the plaintiff had endured being "moved to a different cell at least once per week, with a thorough search, i.e., a shakedown, of his cell each time he is moved… placed in cells next to psychiatric patients who scream, beat on metal toilets, short out the power, flood the cells, throw feces, and light fires, resulting in his loss of sleep for days at a time… [and] moved into filthy, sometimes feces-smeared, cells that formerly housed psychiatric patients." *Id.* at 717. The Court found that these "searches with no purpose but to harass him" amounted to "calculated harassment." *Id.* at 720; *see also Scher v. Engelke*, 943 F.2d 921, 923-24 (8th Cir. 1991) (affirming award of punitive damages for repeated harassing cell searches done in retaliation for a prisoner's complaints about staff misconduct), *cert. denied*, 502 U.S. 952 (1992); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (holding allegation that cell searches and seizures were done in retaliation for lawsuits and grievances stated a constitutional claim).

<u>c. Adequate Sanitation</u>

"A sanitary environment is a basic human need that a penal institution must provide for all inmates." *Toussaint v. McCarthy*, 597 F. Supp. 1397, 1411 (N.D. Cal. 1984), *aff'd in part and rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069 (1987) "Failure to provide adequate cell cleaning supplies, under circumstances such as these, deprives inmates of tools necessary to maintain minimally sanitary cells, seriously threatens their health, and amounts to a violation of the Eighth Amendment." *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (citing *Ramos v. Lamm*, 639 F.2d 559, 567–69 (10th Cir. 1980)).

<u>d. Solitary Confinement</u>

Much has changed since our understanding of the depravity of solitary confinement has matured. In the last two years, recognition of the harms of solitary confinement has become more widespread. *See, e.g.*, *Ruiz v. Texas*, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting from denial of stay of execution) (quoting Justice Kennedy's concurrence, and indicating that he believes the Supreme Court should examine "whether extended solitary confinement survives Eighth Amendment scrutiny").

As Justice Breyer pointed out, even in 1890, the Supreme Court had acknowledged studies showing that "[a] considerable number of the prisoners fell, *after even a short confinement*, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community. It became evident that some changes must be made in the system," as "its main feature of solitary confinement was found to be too severe." *In re Medley*, 134 U.S. 160, 168 (1890) (emphasis added).

Conditions in solitary confinement units have been challenged elsewhere as well. Notably, in Virginia, the Federal District Court of Eastern District of Virginia found that "[g]iven the rapidly evolving information available about the potential harmful effects of solitary confinement—and the explicit incorporation of contemporary standards of decency into the Eighth Amendment standard—it is clear that this Court is not bound by the decades-old determinations made by the Fourth Circuit and the Supreme Court on which defendants rely." *Porter v. Clarke*, 290 F.Supp.3d 518, 529 (E.D. Vir. 2018). The *Porter* Court found that the conditions on Virginia's death row were unconstitutionally cruel and unusual. *Id.* The Court defined "solitary confinement," or restrictive housing, as "any type of detention that involves three basic elements:" "[r]emoval from the general inmate population," "[p]lacement in a locked room or cell," and "[i]nability to leave the room or cell for the vast majority of the day, typically 22 hours or more." *Id*. at 528 (internal quotations omitted). These conditions mirror the conditions Plaintiffs suffered, as alleged in the Amended Complaint.

More affirmatively, the State of Colorado has severely limited the use of solitary confinement to no more than 15 days, and even then, only when there is a finding of a major rule violation. Rick Raemisch, *Why I Ended the Horror of Long-Term Solitary in Colorado's Prisons*, ACLU Blog (December 5, 2018).[1] As noted by the Colorado Department of Corrections director, 15 days follows the standards set by the United Nations Nelson Mandela Rules.[2]

Courts have also held that housing mentally ill prisoners under conditions of extreme isolation is unconstitutional. *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D.Cal. 1995) (holding retention of mentally ill prisoners in California's notorious Pelican Bay isolation unit

---

[1] Link: https://www.aclu.org/blog/prisoners-rights/solitary-confinement/why-i-ended-horror-long-term-solitary-colorados-prisons (Last accessed December 14, 2018).
[2] G.A. Res. 70/175, Rule 44, U.N. Doc. A/RES/70/175 (January 8, 2016), accessible at https://undocs.org/A/RES/70/175 (last accessed December 14, 2018).

unconstitutional). Particularly, the Ninth Circuit has noted that "those who the record demonstrates are at a particularly high risk for suffering very serious or severe injury to their mental health, including overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in the SHU." *Id.* "Such inmates consist of the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression." *Id.* "For these inmates, placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe." *Id.*

### e. Pepper spraying and decontamination

The Ninth Circuit has determined that prisoners like Mr. Anderson who have been exposed to chemical agents have a serious medical need. The Court in *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002), held that prisoners' documentation of "the painful effects of pepper spray" demonstrated the presence of a serious medical need. *Id.* at 904 (citing these effects as meeting the objective component of the serious medical needs test under *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)). The objective component of a deliberate indifference claim is satisfied in showing the harmful effects of prolonged exposure to OC spray. *See, e.g., Clement*, 298, F.3d at 905; *see also Stewart v. Stewart*, 60 F.App'x 20 (9th Cir. 2003) (finding the objective component satisfied because prison administrators knew the prisoner suffered burns, blistering, difficult breathing, uncontrollable gagging, nose bleeds, seizure-like symptoms, and permanent and digestive vision problems as a result of not being allowed to receive medication attention or a decontamination shower for 10 hours).

In addition, the Ninth Circuit has held that a plaintiff's injuries need not be physical in order to constitute a constitutional injury. The "infliction of pain" under the Eighth Amendment

prohibition of "unnecessary and wanton infliction of pain" can also be fulfilled by purely psychological pain. *Jordan v. Gardner*, 986 F.2d 1521, 1526 (9th Cir. 1993) (cross-gender clothed body searches of women prisoners constituted "infliction of pain" where record showed the psychological impact of those searches). Further, even a lack of a *de minimis* injury "does not bar claims for compensatory, nominal, or punitive damages which are not premised on mental or emotional injury." *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002).

Further, the objective prong of the "sufficiently serious deprivation" test can be demonstrated if the plaintiff shows that the risk posed by the deprivation is obvious. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Courts measure what is "obvious" "in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) (citing *Farmer*, 511 U.S. at 842).

### f. Adequate Diet

The Eighth Amendment requires that "prisoners receive food that is adequate to maintain health." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993); *see also Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir.1996), *amended by* 135 F.3d 1318 (9th Cir.1998); *see also Foster v. Runnels*, 554 F.3d 807, 812–13 (9th Cir.2009) (finding the denial of sixteen meals in twenty-three days was a sufficiently serious deprivation for Eighth Amendment purposes).

### 2. The Due Process Clause

The Fourteenth Amendment prohibits prison officials from "treating prisoners in a fashion so 'brutal' and 'offensive to human dignity' as to 'shock the conscience.'" *Vaughan v. Ricketts*, 859 F.2d 736, 742 (9th Cir.1988) (*quoting Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)). "Conduct that amounts to brutality violates a liberty

interest protected by the [F]ourteenth [A]mendment's due process clause, the right to be secure in one's person." Id. Therefore, to defeat a claim of qualified immunity, [the plaintiff] must show that the Officials' conduct was "maliciously and sadistically applied for the purpose of causing harm." *Id.*

In regards to conditions of confinement, "certain changes in conditions may be so severe or so different from ordinary conditions of confinement that, whether or not state law gives state authorities broad discretionary power to impose them, the state authorities may not do so 'without complying with minimum requirements of due process.'" *Sandin v. Conner*, 515 U.S. 472, 483 (1995); see also *Vitek v. Jones*, 445 U. S. 480, 491-494 (1980) ("involuntary commitment to a mental hospital"); *Washington v. Harper*, 494 U. S. 210, 221-222 (1990) ("unwanted administration of antipsychotic drugs"). Deprivations that are "less severe or more closely related to the original terms of confinement nonetheless will amount to deprivations of procedurally protected liberty, provided that state law (including prison regulations) narrowly cabins the legal power of authorities to impose the deprivation (thereby giving the inmate a kind of *right to avoid* it)." *Sandin*, 515 U.S. at 483 (emphasis added); *See Hewitt v. Helms*, 459 U. S. 460, 471-472 (1983) (liberty interest created by regulations "requiring ... that administrative segregation will not occur absent specified substantive predicates"). Ultimately, an inmate has no protected liberty interest in his minimum custody status or other privileges absent an "atypical, significant deprivation." *Sandin*, 515 U.S. at 486.

In *Sandin*, the Supreme Court held that a prisoner's liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life." *Sandin*, 515 U.S. at 483–84 (internal citations omitted). As the Supreme Court observed in *Wilkinson*, *Sandin* made clear that the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin*, 515 U.S. at 484).

a. Solitary Confinement

Prolonged "solitary confinement for over twenty-three hours each day with almost no interpersonal contact, and denied [an inmate] most privileges afforded inmates in the general population" does, while not entirely on its own, implicate the Due Process clause. *Brown v. Oregon Dept. of Corrections*, 751 F.3d 983, 988 (9th Cir. 2014). As will be discussed *infra*, § IV.C.1., Mr. Anderson did not need to be in solitary confinement for 27 months, as the Plaintiff in *Brown* had, to feel the negative health effects of solitary confinement.

b. Excessive Force

The Fourteenth Amendment applies to excessive force claims brought by pretrial detainees. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) ("It is clear … that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.") To analyze an excessive force claim under the Fourteenth Amendment, first, the court assesses the severity of the intrusion by evaluating the type and amount of force inflicted. *Thompson v. Raheem*, 885 F. 3d 582, 586 (9th Cir. 2018). Next, the court evaluates the government's interest by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape.

*Id.* Lastly, the court balances the gravity of the intrusion against the government's need for the intrusion. *Id.*

///

### c. Access to the Courts

Prison authorities have an affirmative obligation to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (*citing Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) for the general principle that incarcerated people have the right to access the courts)).

The "access to courts" right announced in *Bounds* differs from the right to be free from "interference" of that right. In *Lewis v. Casey*, 518 U.S. 343, 351-53 (1996), the Supreme Court announced its "interference" test, which demands that a prisoner prove the following:

1. [The prisoner] was, or is, suffering "actual injury" by being "frustrated or impeded"

2. in bringing a non-frivolous claim

3. about his criminal conviction or sentence or the conditions of his confinement.

### 3. The First Amendment

Grievances filed through an official grievance procedure are constitutionally protected. *Hamilton v. County of San Bernardino*, 325 F.Supp.2d 1087, 1090 (C.D.Cal. 2004) (striking down statute making it a misdemeanor knowingly to file a false misconduct allegation against a police officer). Jails cannot restrict outgoing letters bearing criticisms. *Procunier v. Martinez*, 416 U.S. 396, 413-16 (1974). Nor can they restrict communications with official agencies, or complaints addressed directly to prison officials. *Ustrak v. Fairman*, 781 F.2d 573, 577-78 (7th Cir.) (denial of transfer because of letters to warden was unconstitutional), *cert. denied*, 479 U.S.

824 (1986); *Cain v. Lane*, 857 F.2d 1139, 1143 (7th Cir. 1988) (holding discipline for trying to document inmate complaints about conditions stated a First Amendment claim).

Rules, practices, or actions that interfere with court access are not always unlawful; they will be upheld if they satisfy the *Turner v. Safley* standard of a "reasonable relationship" to legitimate penological goals. 482 U.S. 78, 89 (1987).

As with the "interference" cases, Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

<u>4. The Fourth Amendment</u>

In the pre-trial detainee context, whether a search is reasonable under the Fourth Amendment requires a case-by-case "balancing of the need for the particular search against the invasion of personal rights that the search entails ..." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The required factors for courts to consider include: (1) "the scope of the particular intrusion," (2) "the manner in which it is conducted," (3) "the justification for initiating it," and (4) "the place in which it is conducted." Id. (citations omitted). Strip-searches are particularly invasive, as "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011), *cert. denied,* 131 S.Ct. 2964 (2011), *citing York v. Story*, 324 F.2d 450, 455 (9th Cir.1963) (internal quotations omitted).

*Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (stating that if strip searches "are devoid of penological merit and imposed simply to inflict pain, the federal courts should intervene," and that they may not be used to retaliate against First Amendment-protected activity); *accord, Peckham v. Wisconsin Dep't of Correction*, 141 F.3d 694, 697 (7th Cir. 1998); see *Friedman v. Boucher*, 580 F.3d 847, 856-57 (9th Cir. 2009) (warrantless searches of pre-trial detainees for general law enforcement, as opposed to prison security, purposes violate the Fourth Amendment).

5. Supervisory Liability

Supervisors can be held liable for constitutional violations carried out by subordinates: "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011), *quoting Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) (internal alteration and quotation marks omitted).

Plaintiff acknowledges that the Amended Complaint couches what could better be described as supervisory claims as ones of *respondeat superior*. Plaintiff asks that the Court consider those claims as such, or, in the alternative, allow leave for Plaintiff to amend his Complaint once more to correct this error.

**C. Mr. Anderson's Claims Need to Be Tried Before a Jury**

Mr. Anderson's Amended Complaint divides the various violations of his rights into twelve claims. Mr. Anderson will argue the validity of these claims in order.

1. Claims 1 to 5, 11 to 12: Malicious Strip Searches, Abuse, Unsafe Conditions and Retaliation in the Disciplinary Segregation Unit, aka, Solitary Confinement

Mr. Anderson plead that beginning on or around February 12, 2020, Defendant Fifer unnecessary and malicious strip searches on him. Following these strip searches, Defendants French, Buckwald, and Moore deprived him of a means to grieve. Because of this, his rights under the First, Fourth, Eighth, and Fourteenth Amendments were violated.

Mr. Anderson had been in a segregation cell that was monitored via an in-cell camera. *Anderson Dep. Trans.* 13:13-15. Before leaving the segregation, Defendant Fifer had Mr. Anderson take off his clothes. *Id.* at 13:16-19. Defendant Fifer had Mr. Anderson put his clothes back on then escorted Mr. Anderson to the housing pod. *Id.* at 13:20-21. When they arrived at Mr. Anderson's new housing pod, Defendant Fifer initiated a second strip search:

> [H]e ordered me to remove my clothes again and repeat the same strip-search. Which I told him that I felt it was unnecessary, because we had just did it, and I never left his contact.
>
> He then told me that I was going to do it, fairly aggressively. I said that I didn't feel it was necessary. At which point he placed a hand on the Taser, told me to get naked.
>
> I did that. I performed all the – the moves – maneuvers he wanted me to do.

These maneuvers, Mr. Anderson later describes, were "·lewd postures for amusement." *Id.* at 13:20. Mr. Anderson continued:

> And at the end, during the squat-and-cough, he made me repeat that several times, so – so he could laugh and shine a flashlight at my rectum for the other guards.
>
> And when I protested to this, he was pretty obscene in his gestures.

*Id*. at 13:9-14.

Defendant French, as the Operational Security Lieutenant, did not cease this practice, or discipline Defendant Fifer for this transgression. Defendant Buckwald oversaw the daily

operations and operations at the Lane County Jail. He too did not cease this practice, or discipline Defendant Fifer for this transgression.

Further, these defendants frustrated Mr. Anderson's ability to grieve this transgression. As Mr. Anderson explains, you have to ask staff for a grievance. He asked verbally, but he did not receive a grievance. *Id.* at 17:4-10. When he did send a kyte to request a grievance and also referencing the incident with Defendant Fifer, this kyte was intercepted by Defendant Fifer. *Id.*

The conditions in this segregation cell were deplorable:

- "There was [sic] no cleaning supplies offered to any inmate in segregation." *Id*. at 18:15-17

- "[T]here was [Mr. Anderson's] blood on the floor of the cell..." *Id.* at 21:11-12

- "There was [sic] multiple periods where [Mr. Anderson] was made to sleep on the concrete itself for [which] the longest period of time was five days. And once -- and another time was for two days." *Id.* at 24:9-12.

- "[Mr. Anderson] was denied regular meals…" *Id.* at 42:10.

- "[Mr. Anderson's] food was not the same that other segregation inmates got." 49:11-14.

Mr. Anderson was further subjected to deplorable treatment during the month of July. The first incident began sometime around July 4, and continued until a final humiliation on July 15. In between those dates and beginning on July 4, Mr. Anderson alleges that he was involuntary administered drugs, which will be discussed *infra*, § IV.C.3., that made him mentally incapacitated. *Id.* at 60:15-19.

On July 4, Mr. Anderson claims that, while under his mental incapacitation, he was "punched in the face by Defendant Utter" while being moved from his cell. *Id.* at 65:6-66:20. His

hands had already been leashed to a tether through the door. *Id.* Defendant Bedsaul had been

pulling on the tether, making it impossible for Mr. Anderson to get on the ground. *Id.* Defendants

Utter and Fifer were yelling at him to get on the ground, but because of the tether, he could not

comply. *Id.* Mr. Anderson then claims that Defendants Utter and Fifer struck him multiple times

as he was trying to get down. *Id.* Still, Mr. Anderson could not get to the floor because of the

tether. *Id.* When we would not get on the floor, Defendant Fifer tasered him in the left shoulder,

and Defendant Utter kneed him in the torso. *Id.* After tasing him, Defendant Fifer began

punching Mr. Anderson in the back of the head. *Id.* Mr. Anderson inched closer to the floor, but

still was not flat, as he was dangling by his arms. *Id.* Defendant Fifer again tasered him, then

again. *Id.* Defendants Utter and Fifer put their full weight on him, and Mr. Anderson finally

came to the floor as the tether loosened. *Id.* Mr. Then, Mr. Anderson was lifted up by his "throat,

carried to another cell by the front of [his] throat, where [he] couldn't breathe, and then slammed

onto [his] face in on another bunk in a separate cell." *Id.*

Mr. Anderson suffered through ordeal, and continued to mentally decompensate. This

came to head on July 15, when Mr. Anderson was humiliated in front of a group of Lane County

Jail employees. The officers had Mr. Anderson leave in his cell. *Anderson Dep. Trans.* 72:8-24.

Mr. Anderson was wearing a DSU smock, which he was told to remove. *Id.* While naked, he was

restrained, and walked out into the hallway. *Id.* Mr. Anderson was then lead into a room of at

least 10 to 15 staff members, some of whom were women. *Id.* Mr. Anderson, entirely naked, had

to wait while someone got him clothes. *Id.* He waited long enough to hear the laughter and

banter of female and male staff. *Id.*

A reasonable juror could conclude that Mr. Anderson had his rights violated by these Defendants, and viewing the facts in a light more favorable to him, Defendants should not be granted summary judgment on this claim.

### 2. Claim 6: Pepper Spray and Inadequate Decontamination

Mr. Anderson claims that he was excessively pepper sprayed and made to suffer without proper decontamination on or about June 25, 2016. Mr. Anderson had been speaking to a Deputy Woolsey through his Seg-Med door, when an officer (believed to be Defendant Fifer) pepper sprayed him from what appeared to be a fire hose. *Am. Complaint*, ¶ 77, Dkt. 100. After being pepper sprayed from groin to head, Mr. Anderson ran to the shower. *Id.* at ¶ 78. In the shower, he only had a "wet rag" to clean himself, as the water had already been shut off. *Anderson Dep. Trans.* 52:25-53:5. He could not wash his eyes with this rag. *Id.* After leaving the shower, Defendant Fifer shot Mr. Anderson with about 30 pepper ball pellets from 10 to 15 feet away. *Id.* at ¶ 79. Following this, Mr. Anderson was held down for five minutes while Defendant Ceuhlo forcibly injected Mr. Anderson, discussed further *infra*, § IV.C.3.

A reasonable juror could conclude that Mr. Anderson had his rights violated by these Defendants by improperly pepper spraying Mr. Anderson without adequate means to decontaminate himself, and viewing the facts in a light more favorable to him, Defendants should not be granted summary judgment on this claim.

### 3. Claims 7 to 9: Forcible Medication, Failure to Treat, and Use of Force

Mr. Anderson claims that on June 25, 2016 and on or about July 3rd or 4th, he was forcibly administered intramuscular injections of Ativan, Benadryl, and Haldol. Mr. Anderson was not provided any opportunity to consent to the injection pre-administration.

OAR 309-114-0015(1)(a), (b) provides that medication can be forcibly applied in an emergency if: "Immediate action is required to preserve the life or physical health of the patient and it is impracticable to obtain informed consent as provided in OAR 309-114-0010 (General Policy on Obtaining Informed Consent to Treatment and Training)" and "Immediate action is required because the behavior of the patient creates a substantial likelihood of immediate physical harm to the patient or others in the institution and it is impracticable to obtain informed consent as provided in OAR 309-114-0010 (General Policy on Obtaining Informed Consent to Treatment and Training)." This decision to administer psychotropic medication forcibly is to be made by the "chief medical officer or designee." OAR 309-114-0015(2).

According to the National Commission on Correctional Health Care's "Standards for Health Services in Jails," (2014), following the forced medication of a detainee the follow-up care should include:

> "1. Checking with the patient… at least once within the first 15
>
> minutes, then every 30 minutes until transfer to an inpatient
>
> setting…"
>
> 2. Assessing mental status…
>
> 4. Observing behavior, such as psychosis, assaultive, agitated…
>
> 6. Take vital signs…"

*Id.* at p. 147-8.

As detailed by Mr. Anderson, during the June 25, 2016 injection, Mr. Anderson was not ordered to have the injection by Defendant Battle, the chief medical officer; Defendant Moore had, to which Defendant Ceulho complied.

As Mr. Anderson explains, the combination of forced medication and OC spray caused him to collapse in his cell:

> I couldn't -- I couldn't see or breathe, because I was covered in the path of pepper spray balls and the OC Sabre spray. And when they let me out of my restraints, they left the cell. And I was derobed. I stood up and tried to find my way to the sink or wash my face. But immediately I started to lose consciousness. I started screaming for help, because I didn't know what was happening to me. I didn't know what she just put into my body. I was fairly confident that they had just killed me. So I was screaming, asking for, you know, someone to help me. And fell down and hit my head on the wall hard enough to knock me back into consciousness. And I remember standing up two or three times to try to get up, but falling back down onto the bunk area and hitting my head on the wall until -- until I just blacked out.

*Anderson Dep. Trans.* 120:14-121:8.

Mr. Anderson started to have "auditory hallucinations." *Id.* at 121:21-25. He was not checked up on during this period, and his decompensation worsened, until he began sucking blood out of a wound and spitting it on the floor. *Id.* at 126:21-24. Defendant Richtenstein did not examine Mr. Anderson directly, and only learned of these incidents following a phone call from the deputies. *Am. Comp.* ¶¶ 88-90.

By July 3, 2016, Mr. Anderson had been denied a shower to clean the OC Spray since June 25, and his mental health deteriorated further. He began to self-harm, but was not evaluated by mental health or medical personnel. *Id.* at ¶¶ 102-103. Instead, the officers again decided to forcibly medicate Mr. Anderson, pulling him deeper into psychosis. *Id.* at ¶ 103. As discussed above, Mr. Anderson was subjected to severe use of force on July 4, causing him great pain and injury. On July 5, Mr. Anderson was again forcibly medicated under similar circumstances, this time by Defendant Valdenegro. *Id.* at ¶ 142.

Despite the beatings and self-inflicted injuries to his wrist, Defendant Battle did not evaluate Mr. Anderson's condition. On July 8, 2016, Defendant Battle "examined" Mr. Anderson through the plexiglass window into his cell. *Id.* at ¶ 135. Previously, Mr. Anderson had been "vomiting blood," causing concern to a jail deputy who called for medical personnel, but Defendant Battle did not respond because he was "busy." *Anderson Dep. Trans.* 140:1-17.

These incidents of forced medication without adequate medical evaluation or follow up continued unabated throughout this period. Defendants Fifer, Utter, Bedsaul, Valdenegro, Richtenstein, Ceulho, Battle, French, Buckwald, and Moore participated in these deprivations.

A reasonable juror could conclude that Mr. Anderson had his rights violated by these Defendants by improperly medicating him and denying him adequate medical care, and viewing the facts in a light more favorable to him, Defendants should not be granted summary judgment on this claim.

## V. CONCLUSION

For the reasons above, Plaintiff respectfully requests that this Court deny Defendants' Supplemental Motion for Summary Judgment.

DATED:  June 8, 2020.

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
Attorney for Plaintiff